UNITED STATES DISTRCT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
UNITED STATES OF AMERICA,

                Plaintiff,                **Docket No.: 0207  1:11CR00486-18**

    -against-

LEE KARAQI,

                Defendant,
-------------------------------------------------------X

## **I. INTRODUCTION**

Lee Karaqi is scheduled to appear before the Court on December 20, 2012 to be sentenced for his limited role in a conspiracy to distribute marijuana in violation of 21 U.S.C. Sections 846, 841 (b)(1)(C). Upon review of the Pre-Sentence Report ("PSR") prepared by the Probation Department, Mr. Karaqi agrees principally with the Advisory Guideline Computation contained therein with the exception of applying Guideline 2D1.1(b)(1), which relates to the possession of a firearm during the commission of a narcotics' offense.

The basis for the legal objection to the enhancement is set forth in the letter dated October 10, 2012 from defense counsel to Probation Officer, Mary Ann Betts. Notably, the objection appears to be a legal objection as opposed to a dispute of material facts that would necessitate a hearing. Recognizing the inequities in applying the enhancement to Mr. Karaqi's case, Officer Betts notes that the facts surrounding the gun possession at bar fall outside the heartland of Guideline 2D1.1(b)(1) and warrant a variance. While Probation and the Government contend that Mr. Karaqi's Guideline range is 24 to 30 months, Officer Betts recommends a

custodial sentence of one year and a day. It is respectfully submitted that this recommended custodial sentence is unnecessary to effectuate the penal goals of sentencing.

Although the PSR provides a great deal of information about Mr. Karaqi's personal history and background as well as information relevant to the instant offense and sentencing, this Memorandum is submitted as a supplement to the prior filings of defense counsel to aid the Court in fashioning an appropriate sentence based upon all the factors set forth in 18 U.S.C § 3553(a), *Gall v. United States*, 128 S.Ct. 586 (2007); *United States v. Booker*, 125 S.Ct. 738 (2005); *United States v. Cavera*, 550 F.3d 180 (2d Cir 2008). It is respectfully submitted that the imposition of a probationary sentence is reasonable in order to comply with the sentencing objectives embodied at 18 U.S.C § 3553(a) and we ask that the Court impose such sentence.

Based upon the nature and circumstances of the instant offense and the history and characteristics of Mr. Karaqi, it is submitted that a probationary sentence is entirely consistent with the spirit of the Guidelines and that a non-custodial sentence is certainly "sufficient but not greater than necessary" to fulfill the purposes of sentencing.

## II. BASIS FOR A NON-GUIDELINE SENTENCE

### A. The Controlling Law

In the aftermath of *United States v. Booker,* 125 S.Ct. 738 (2005), the Second Circuit has guided district courts as to the appropriate procedure to follow in imposing sentence. *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), *United*

*States v. Cavera*, 550 F.3d 180 (2d Cir. 2008). In a series of subsequent decisions, the Supreme Court and the Second Circuit have confirmed that under the Advisory Guideline regime, "a sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *Gall v. United States*, 552 U.S. 38 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007); *Nelson v. United States*, 129 S.Ct. 890 (2009).

In *Rita v. United States*, 551 U.S. 338 (2007), the Court held that the Guidelines "insofar as practicable, reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Id*. at 350. In *Nelson v. United States*, 129 S.Ct. 890, 891-92 (2009) (per curium), the Supreme Court observed, "[o]ur cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable... The Guidelines are not only not mandatory on sentencing courts, they are also not to be presumed reasonable."

A court must endeavor to impose a "reasonable sentence" based upon all the factors enumerated in 18 U.S.C. § 3553(a). *United States v. Cavera*, 550 F.3d 180 (2008). A "reasonable sentence" is defined by 18 U.S.C. § 3553(a)(2) as one "sufficient, but not greater than necessary" to fulfill the sentencing objectives of Congress. Those objectives include, among other things, punishment of the offender, affording adequate deterrence to criminal conduct, and the protection of the public from future crimes by the defendant, *inter alia*. *See* 18 U.S.C. § 3553(a). Section 3553(a)(i) requires that the sentencing Court consider "the nature and circumstances of the offense, and the history and characteristics of the defendant." Upon a meaningful examination of Mr. Karaqi's background, experiences and

3

character as demonstrated by the information contained within the PSR, this Memorandum and the annexed letters and documentation, it seems that a custodial sentence is not necessary in order to effectuate the sentencing objectives of Congress. As such, it is respectfully suggested that this Court impose a reasonable, probationary sentence that will allow Mr. Karaqi to continue to work to provide the financial and emotional support that he currently extends to his wife and four sons.

B. **The Relevant Facts**

At thirty-six (36) years of age, Mr. Karaqi was arrested for the first time in his life and was charged with conspiring to distribute marijuana. He readily admitted his guilt and was one of four of the first defendants in this multi-defendant case who pleaded guilty in April of 2012. Unfortunately for Mr. Karaqi, his foray in violating the law involved serious allegations surrounding Gjavit Thaqi, the father of his sister's children. As a result of this familial relationship with Thaqi and what can only be described as an aberrant lapse of judgment, Mr. Karaqi found his name on the face of an indictment with forty-nine other people, including his sister, Magdalena Nikollaj and his brothers, Robert and Al. While the indictment details various conspiracies beginning in 2001, involving marijuana, cocaine and ecstasy it is uncontroverted that Mr. Karaqi merely introduced a supplier of marijuana in California to Thaqi thereby "brokering" the exchange of approximately forty-six (46) pounds of marijuana for which he received approximately Two Thousand Dollars ($2,000.00). The PSR notes that:

> During June of 2011, Gjavit Thaqi was introduced to a major marijuana distributor from California (whose

> identity is known to the Government) by Lee
> Karaqi...[who] twice facilitated marijuana sales to Thaqi
> from the third party.

PSR at ¶10. The first transaction involved ten (10) pounds and the second transaction involved thirty-six (36) pounds.[1] As related in the PSR, "[t]here is no evidence that [Mr.] Karaqi was involved in the distribution of other drugs (cocaine and Ecstasy) distributed by the organization." PSR at ¶17. In concluding that a minimal role adjustment is appropriate, the PSR further notes that there is no indication or evidence that Mr. Karaqi was involved in the conspiracy prior to 2011 and his role in "facilitating two marijuana sales was not a typical drug sale; instead, he provided the location and communicated between Thaqi and a marijuana source, with no proprietary interest in the marijuana." *Id.*

In or about 2011, Thaqi was openly involved in a romantic relationship with Mr. Karaqi's sister, Magdalena. All of the Karaqi' brothers were known in the community as industrious and hardworking contractors and tradesmen. Mr. Karaqi owned a construction and property management company called PMK Painting. He had started PMK from nothing and before long had grown the operation relying principally on management contracts with Maxx Properties an owner and management of apartments in Westchester County where he ultimately moved his

---

[1] In addition to the reasons set forth herein, it should be noted that the suggested Base Offense Level of 20 was predicated upon drug quantity of 40 to 60 kilograms. The limited dealings that Mr. Karaqi was personally involved with totaled approximately 46 pounds, which is approximately 20 kilograms, substantially less than the 50 kg threshold necessary to increase the statutory maximum from 5 years to 20 years under 841§§(b)(1)(C)(D). But regardless of the statute, using the actually quantity handled by Mr. Karaqi, his base offense level would be at least 2 points lower than 20 under §2D1.1. This overstatement of drug quantity attributable to Mr. Karaqi is certainly another factor that the Court should consider in imposing a variance from the Advisory Guideline Range.

offices. As much as he was known for his construction business, Mr. Karaqi was also known in the community as being associated or "around" his sister's boyfriend, who had recently been released from prison and had garnered a reputation for being involved in the marijuana trade.

Due to this familial association, Mr. Karaqi "was regularly approached by individuals who wanted to be introduced to Mr. Thaqi for criminal purposes." PSR at ¶ 21. On one occasion, an individual from California, who knew a friend of Mr. Karaqi, approached him and asked if he could get his marijuana to Thaqi to see if he was interested in buying it. In a monumental lapse of judgment, Mr. Karaqi agreed and arranged a meeting that resulted in the transfer of the drugs. There was no specific arrangement as to what Mr. Karaqi would be paid for making the introduction, which resulted in the nominal gratuitous payment that has since been forfeited. And notwithstanding this initial introduction, there was no agreement or understanding that Mr. Karaqi would be paid additional sums for future dealings between the parties. Simply put, Mr. Karaqi was not a member of any drug organization or group but merely engaged in an isolated act while working full time at his legitimate construction business. In accepting responsibility for his role in the offense, Mr. Karaqi admitted that making the introduction was a "horrible mistake" and constituted "bad judgment" on his part. PSR at ¶ 21.

Renata, Mr. Karaqi's wife was shocked upon learning of her husband's arrest and the allegations that he and his siblings were involved in drugs. When Mr. Karaqi candidly confided to her as to his role in the offense, Mrs. Karaqi was devastated and felt betrayed by the man she describes as now "remorseful" and "ashamed" of what

he did. In recounting how she and her husband dealt with the pendency of the criminal case, she writes:

> July 13, 2011 has forever changed our lives...I was engulfed with every emotion imaginable. How he ever got involved in this predicament is so incomprehensible to me knowing that was not the man I fell in love with and married. I know, had Lee given any meaningful thought to the decision to get involved with marijuana, he would not have. We discussed this situation in length and are aware of the major obstacles that lie ahead for us. I have decided to stand by and forgive his actions because he is a great husband, devoted father and a wonderful person who briefly lost his way.

*Letter of Renata Karaqi dated 11/16/2012,* annexed as **Exhibit A-Letters in Support**

Nancy Erickson, a neighbor of Mr. Karaqi echoed Mrs. Karaqi's sentiments concerning the type of person that will stand before this Court later this month to be sentenced. Ms. Erickson characterizes Mr. Karaqi as a "selfless, kind-hearted soul" who would regularly walk hand in hand with her two-year-old daughter, "always smiling" and acting in a kind and loving manner. She asks that this Court consider the fact that Mr. Karaqi continues to suffer for the mistake he made:

> Lee had to endure the shame of being involved with marijuana. He lost his job and now struggles to keep his family afloat in these tough times and all the while living with the disgrace of forever changing his and his young family's lives.

*Letter of Nancy Erickson dated 11/20/2012,* annexed as **Exhibit A-Letters in Support**

The notoriety associated with this case caused Mr. Karaqi's contracting company to loose its principal account with Maxx Properties resulting in the fiscal

collapse of PMK. PSR at ¶54. After his arraignment and against the advice of counsel, Mr. Karaqi voluntarily disclosed his arrest to the principals of Maxx. At the time of the disclosure, PMK was in the middle of several lucrative renovation contracts and had completed a substantial number of work orders to repair various apartments owned and managed by Maxx. In response to the disclosure, Maxx directed that Mr. Karaqi and PMK stop all work and remove their materials from the various projects. The cessation of new projects accompanied by Maxx's refusal to pay for work already performed caused PMK to lay off the bulk of its employees. Mr. Karaqi was unable to pay his suppliers and after exhausting his personal funds to pay business debt and to finance his legal defense, he was unable to pay his personal mortgage and real estate taxes on his marital home. In the wake of complete financial ruin, Mr. Karaqi endured, agreeing to perform menial appliance installation jobs for a major department store. After months of exemplary service, in July of 2012, he began receiving referrals from customers of the department store for sizable renovation projects. The number of appliance installation work orders with the department store has increased over 400% in the last two months. This increase in revenue has allowed Mr. Karaqi to come current on his real estate tax obligations, pay off his debt to the IRS and to reinstate his mortgage on his house. Consistent with his proven post-arrest efforts to be a productive member of his society, his wife writes that her husband "is the rock that holds this family together. Without him, we have nothing. Fortunately for us, Lee is an ambitious man who drives himself to provide for his family."

### i. The unique circumstances of Mr. Karaqi's case renders the application of Guideline 2D1.1(b)(1) fundamentally unfair and outside the heartland of typical narcotic cases where a firearm enhancement is generally justified.

It would be fundamentally unfair to enhance Mr. Karaqi's sentence by two points due to the manner in which he possessed his registered handgun. It would also be a miscarriage of justice not to afford him the additional two point safety valve reduction given the Government position that he in ineligible to proffer, notwithstanding his willingness to do so. [2]The PSR notes that the facts of Mr. Karaqi's case "may be viewed as being outside the heartland of a typical drug trafficker who possessed a handgun." Indeed, it is hard to imagine a more compelling set of facts that would warrant mitigation in the face of such an enhancement. The PSR reflects a two (2) point increase in Mr. Karaqi's Base Offense Level because a licensed and unloaded firearm was recovered in his desk drawer at his office where he operated his construction company. The gun was never brandished or used to threaten or intimidate anyone. The Government has agreed

---

[2] It is important to note that even if the Court were to find that the 2 point enhancement was appropriate, Mr. Karaqi contends that he is nonetheless eligible for a safety value because of the different standards of proof for application of §2D1.1(b)(1) (if weapon was present, defendant bears burden of proving it was "clearly improbable" that the weapon was connected with the offense) and §5C1.2(a)(2) (defendant bears burden of proving by preponderance of evidence that weapon was not connected with offense). *See United States v. Zavalza- Rodriguez*, 379 F.3d 1182, 1187 (10th Cir. 2004)("[T]here is a difference in evidentiary standards when applying the two provisions [§2D1.1 and §5C1.2]."); *United States v. Nelson*, 222 F.3d 545, 549-50 (9th Cir. 2000). *See also United States v. Scott*, 2005 U.S. Dist. Lexis 44044 (2005 E.D.N.Y.)(Defendant should be entitled to testify at Fatico hearing that he never intended to use firearm that he constructively possessed in connection with drug offense thereby rendering him eligible for safety valve).
9

that Mr. Karaqi qualifies for a minimal role adjustment due to the fact that his participation in the conspiracy was limited in scope and duration. Consistent with this minimal role, Mr. Karaqi has agreed to forfeit the paltry sum of Two Thousand Dollars ($2,000.00), which represents the fruits of his unlawful activity.

To the best of Mr. Karaqi's knowledge nobody knew that the gun was even brought to his office in order to keep it away from his four (4) small children. Prior to his arrest, federal agents knew Mr. Karaqi owned the firearm, which was registered in his personal name under his validly issued Westchester County permit. Upon his arrest and upon inquiry of the arresting agents, Mr. Karaqi was polite, courteous and cooperative, immediately disclosing the whereabouts of the gun at his office. The agents then transported him from his house to his office. Upon his arrival, other agents were executing a search warrant and Mr. Karaqi readily directed them to the location of the firearm, which was packaged away inside two boxes in a locked drawer. There was no ammunition inside the gun or even in the office. Since Mr. Karaqi purchased the gun, it was only discharged on one occasion at a firing range. And after firing the weapon, he was uncomfortable keeping it in the house where his children might access it so he brought it to work.

In total, the application of the firearm enhancement results in a four-point net adjustment in Mr. Karaqi's Total Offense Level. In addition to the two (2) point increase, Mr. Karaqi is ineligible for an additional two (2) point safety valve reduction. In this regard, it should be noted that defense counsel discussed arranging a safety valve proffer prior to sentencing but the Government indicated that there is no need for the proffer unless this Court were to rule the firearm

enhancement inapplicable to the facts of the case. Given the limited and uncontroverted nature of Mr. Karaqi's involvement in the charged conspiracy, it is respectfully submitted that a proffer would be of no real value to the Government and would provide no additional facts or identify any uncharged co-conspirators who are not already cooperating with the Government. As a result, without the 2D1.1(b)(1) enhancement, Mr. Karaqi would receive a net adjusted benefit of four (4) points off the Total Offense Level set forth in the PSR. At a level thirteen (13), as opposed to seventeen (17), with a Criminal History Category I, Mr. Karaqi's Advisory Guideline Range would have been twelve (12) to eighteen (18) months.

A four (4) point reduction in Mr. Karaqi's Guideline range should be applied given the unusual and mitigating facts attendant to his case.

> **ii. Mr. Karaqi's extraordinary responsibility to care for and provide financial support for his wife and four sons warrants a downward departure under Guideline 5H1.6.**

Mr. Karaqi is dedicated husband and father to his four young boys. Augustine, his oldest son is ten (10) years old and goes to the same elementary school with his brother Santino, age seven (7). His youngest son, Francis is two (2) years old and is in the care of Mrs. Karaqi during the day. Vincent, who is three (3) attends a special school for a few hours a day due to speech development issues. However, excepting the issues attendant to the delayed speech, all of the Karaqi boys are healthy. Their father and mother are both affectionate and caring parents. And while Mr. Karaqi is the sole source of financially support, his children depend on him for much more than shelter and regular meals.

11

Pre-*Booker* downward departures pursuant to U.S.S.G. 5K2.0 were permissible where a specific sentence could result in serious hardship for the defendant's family. *See United States v. Alba*, 933 F.2d 1117 (2d Cir. 1991). In *Alba*, the court held that while family circumstances are not ordinarily relevant for purposes of deviating from the Guidelines, a departure was warranted because the defendant supported his wife of 12 years, two young daughters and his grandmother. Here, it is without question that any custodial sentence would result in tremendous hardship for the Karaqi family. Indeed, the PSR specifically opines that as the sole provider for his wife and small children, Mr. Karaqi's would be eligible for a downward departure under Guideline 5H1.6. *See also United States v. Johnson*, 964 F.2d 124 (2d Cir. 1992)(affirming a 13 level downward departure for extraordinary family circumstances because the defendant was sole caretaker for his 4 children); *United States v. Gerard*, 782 F.Supp. 913 (S.D.N.Y. 1992)(departure warranted where defendant was provider for his two children); *United States v. Galante*, 111 F.3d 1029 (2d Cir. 1997)(affirming where a 41 year old married, first time offender, who was the primary source of financial support for his family which included two infant children warranted a departure from a level 23 to a level 10 and a sentence of time served).

The facts of Mr. Karaqi's case are rather unique. Prior to making the introduction that gave rise to his arrest, Mr. Karaqi was developing and growing a legitimate contracting business. He filed tax returns, supported his family and had purchased a modest but comfortable home in Westchester County. His accomplishments resulted from hard work with very little formal education. Mr.

Karaqi dropped out of high school in the tenth grade, finding the volatile and often dangerous environment of Roosevelt High School in Yonkers too difficult to endure. PSR @ ¶50. Notwithstanding the absence of a high school degree, Mr. Karaqi worked hard to help his parents pay household bills. He took jobs as porters in apartment buildings, went to trade school to restore marble and ultimately obtained a home improvement license. After enduring the disastrous financial effects of his arrest, Mr. Karaqi rebuilt his business in order to sustain his family. Not only did he continue to provide for his family but he did so while satisfying tax deficiencies to the taxing authorities and paying outstanding credit card debt. His financial condition remains volatile but he continues to fight and struggles to ensure that his family is not dependent on welfare or otherwise deprived of life necessities. For these reasons, I significant departure from the Guidelines is warranted.

> iii. **During the 17 months that this case has been pending, Mr. Karaqi has turned his life around and any period of incarceration would jeopardize the welfare of his family and undermine the rehabilitative efforts that warrant a variance from the Advisory Guidelines.**

Rehabilitation between the offense conduct and sentence can warrant the imposition of a minimum sentence outside the Advisory Guidelines. In *United States v. Workman*, 80 F.2d 688 (2d Cir. 1996) and *United States v. Maier*, 975 F.2d 944 (2d Cir. 1992), the Second Circuit ruled that a downward departure, pursuant to Guideline section 5K2.0, based upon rehabilitation is permissible.

Post offense rehabilitation has been recognized by numerous courts as a basis for the imposition of a non-guideline sentence. In *United States v. Hawkins*,

380 F.Supp.2d 143 (E.D.N.Y. 2005) the court elaborated in a 46-page decision how an analysis of the factors set forth in 18 U.S.C. § 3553(a) would warrant the imposition of a non-guideline sentence where significant proof of post offense rehabilitation demonstrates that the likelihood of recidivism is remote, the goals of deterrence have already been attained and the effects of imprisonment upon the present life of the defendant would so adversely affect rehabilitation as to be inappropriate. The *Hawkins* court imposed a sentence of probation upon a defendant with a sentencing range of 12-18 months despite the fact that the defendant engaged in further criminal activity.

The "Parsimony Clause" contained in 3553(a) mandates that the sentencing court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." Those factors, as they relate to Mr. Karaqi, strongly favor a variance from his Advisory Guideline Range. 18 U.S.C. 3553(a)(2)(A) requires that the court first consider the traditional sentencing objective of just punishment for the offense. Subsections 3553(a)(2)(B) and (a)(2)(C) require that the court consider the need for the sentence to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant, or put another way, to accomplish the objectives of both general and specific deterrence. All of the penal law objectives are accomplished without the need of imposing a custodial sentence and accordingly, it is respectfully submitted that a probationary sentence is appropriate here.

### III. CONCLUSION

For the aforementioned reasons, it is respectfully requested that the Court impose a non-custodial sentence that would permit Mr. Karaqi to continue to work and provide the financial and emotional support that he currently provides to his family.

GALGANO & ASSOCIATES

/S
_____
By: George W. Galgano, Esq.
GWG 8009
399 Knollwood Road, Suite 203
White Plains, New York 10603